# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| RICHARD B. WINEBARGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 17-04072-CV-C-SRB |
| | ) |
| CORIZON, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court are Corizon LLC's Motion for Summary Judgment (Doc. #106) and Defendant Sturm's Amended Motion for Summary Judgment and Suggestions in Support (Doc. #116). Corizon LLC's Motion for Summary Judgment (Doc. #106) is DENIED and Defendant Sturm's Amended Motion for Summary Judgment (Doc. #116) is GRANTED.

**I.	Legal Standard**

A moving party is entitled to summary judgment on a claim "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine dispute over a material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (citation omitted).

"Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011) (citation omitted). A party opposing summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

"[S]ummary judgment should not be granted if a reasonable jury could find for the nonmoving party." *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). The purpose of summary judgment "is not to cut litigants off from their right of trial by jury if they really have issues to try." *Hughes v. Am. Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir. 1976) (internal quotation marks omitted) (quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 467 (1962)).

## II.     Background

Since Plaintiff Richard B. Winebarger filed the Complaint on May 8, 2017, several claims and parties have been dismissed. The remaining defendants are Corizon, L.L.C., Matt Sturm, and three John/Jane Doe Defendants. In its present motion, Defendant Corizon asks the Court to find that it is entitled to summary judgment as to the claims that remain against it: 1) Count I – 42 U.S.C. § 1983 claim for deliberate indifference to serious medical need and failure to provide medical care and treatment in violation of the Eighth Amendment; 2) Count II – § 1983 claim for failure to train/inadequate training in violation of the Eighth Amendment; and 3) Count III – § 1983 claim for failure to supervise, direct, and control/inadequate supervision, direction, and control in violation of the Eighth Amendment. By separate motion, Defendant Sturm asks the Court to find he is entitled to summary judgment as to the claims that remain against him: 1) Count IV – § 1983 claim for deliberate indifference to serious medical need and

failure to provide medical care and treatment in violation of the Eighth Amendment; and 2) Count V – § 1983 claim for failure to supervise, direct, and control/inadequate supervision, direction and control in violation of the Eighth Amendment.

Considering the parties' statements of fact and supporting evidence in the light most favorable to Plaintiff as the non-moving party, the Court finds the relevant facts to be as follows:

On May 12, 2012, Plaintiff pled guilty to a charge of receiving stolen property and was sentenced to fifteen years with a suspended execution of sentence and five years of supervised probation. On August 5, 2014, Plaintiff's probation was revoked, and on August 8, 2014, he was remanded to Fulton Reception and Diagnostic Correctional Center ("FRDC"). Defendant Corizon is a corporate correctional health care provider contracted by the Missouri Department of Corrections ("MDOC") to provide health care services for all inmates confined to state correctional facilities, including FRDC.

At all relevant times, Defendant Sturm was the MDOC Director of the Division of Offender Rehabilitative Services ("DORS"). DORS is responsible for the development of treatment and service programs for offenders, including health care. Defendant Sturm has no medical training and did not provide medical care to Plaintiff.

While on probation in July 2012, Plaintiff underwent the implantation of an AICD/Pacemaker device, which is designed to shock his heart back into a normal rhythm and save his life from an underlying disease process of ventricular fibrillation. On April 17, 2014, while still on probation, Plaintiff was diagnosed with hypertrophic obstructive cardiomyopathy ("HOCM") by Dr. Ha at Hannibal Regional Hospital. Dr. Ha's notes from Plaintiff's April 17, 2014, visit state Plaintiff "presented to the hospital with recurrent syncope within the last several months[,]" and "[p]atient will be consulting with Dr. Richard Bach at Barnes-Jewish Hospital

("BJH") for possible consideration of alcohol septal ablation versus septal myomectomy to prevent recurrent syncope episodes."[1]

During his Receiving Screening at FRDC on August 8, 2014, Plaintiff reported he had an AICD/Pacemaker. Plaintiff also reported his hypertrophic cardiomyopathy diagnosis and that he had seen a medical professional regarding his heart in the last six months. Dr. Alfred Garcia, the Corizon Medical Director at FRDC, enrolled Plaintiff in Corizon's chronic care clinic for cardiovascular care.

The parties presented to the Court thorough and lengthy statements of Plaintiff's medical history at FRDC. While the parties may disagree about the level of care rendered to Plaintiff, the parties generally agree as to the timeline of medical events. The summary contained in this Order is not comprehensive but highlights the primary issues regarding Plaintiff's care.

Inmates' electronic medical records are maintained in the "Medical Accountability Records System" or "MARS." Inmate medical files include both paper and computerized records. Paper records are filed and computerized records are maintained in the MARS system. The parties rely on both paper and electronic medical records in detailing Plaintiff's medical history for the Court.

On August 14, 2014, and again on August 25, 2014, Plaintiff had self-declared medical emergencies for chest pain. Plaintiff was seen by a nurse on both occasions and was cleared to leave medical. On August 29, 2014, Plaintiff had a medical emergency for chest pain and was evacuated by ambulance to St. Mary's Hospital ("SMH"). Admission notes from the August 29 hospitalization state, "Records from Hannibal Hospital from the Spring of this year showed . . .

---

[1] Dr. Spencer Melby, Plaintiff's cardiac surgeon at BJH, testified that syncope is when someone "passes out."

4

that they intended to refer [Plaintiff] to Barnes Hospital for either alcohol catheter ablation therapy or surgery." On August 30, 2014, Plaintiff was evaluated by Dr. Ubeydullah Deligonul, a cardiologist at SMH, who opined that since Plaintiff's "exertional positional dizziness and presyncopal symptoms" have not been resolved by "ventricular pacing," he "is a candidate for alcohol septal ablation versus septal myectomy and will need to be referred to Barnes Hospital for these procedures." The "Summary of Care" from the August 29 hospitalization lists "chest pain" and HOCM as diagnoses and states: "Needs referral to Barnes Cardiology next week." Plaintiff was discharged from SMH on August 30, 2014, and admitted to the FRDC transitional care unit ("TCU").

Plaintiff had self-declared emergencies on September 1 and September 2, 2014. On September 3, 2014, Dr. Garcia submitted a Referral Request for a cardiology consult with Dr. Conrad Balcer at SMH. The request was approved on September 4, 2014, by Dr. Bredeman, Corizon's Associate Regional Medical Director. Also on September 4, 2014, Plaintiff had a self-declared emergency for chest pain and was taken by ambulance to SMH where he was admitted. Both the admission notes and "Assessment and Plan" documents from Plaintiff's September 4 hospital admission mention the recommendation from Plaintiff's prior hospital admission that he be referred to BJH for evaluation and surgical intervention.

On September 5, 2014, Plaintiff was evaluated by Dr. Conrad Balcer who opined, "I think it is reasonable to discharge him to outpatient follow up, as I am told he has a follow up appointment at Barnes Hospital next week." Also on September 5, 2014, Plaintiff was seen by Dr. Sanfelippo at SMH. Dr. Sanfelippo performed a Transthoracic Echocardiogram which identified "severe concentric hypertrophy" in the left ventricle and "severe, anterior (immediately subvalvar) left ventricle outflow obstruction" in the aortic valve. Dr. Sanfelippo's

notes characterized Plaintiff's condition as "Mild to mod obstruction[.]" Plaintiff testified that Dr. Balcer and Dr. Sanfelippo told him during his September 4 hospital admission that his HOCM was "mild" and did not require surgery at that time. The "Summary of Care" from Plaintiff's September 4 hospital admission lists "chest pain" and "Cardiomyopathy" as diagnoses and states, "Follow up instructions: Barnes Jewish Hospital, keep your appointment with Cardiology as scheduled." The "Summary of Care" was reviewed by Dr. Garcia. Dr. Garcia did not make any further requests for outside cardiology evaluations after Dr. Balcer evaluated Plaintiff on September 5, 2014.

Plaintiff was discharged from SMH on September 6, 2014, and was transferred to the FRDC TCU where he stayed until October 8, 2014. On September 13, 2014, Plaintiff's AICD/Pacemaker fired, knocking him to the ground. On September 19, 2014, Plaintiff's AICD/Pacemaker fired twice; Plaintiff fell, hit his head on the floor, and required stitches. In TCU discharge papers dated October 8, 2014, Dr. Garcia wrote, "He feels he needs to have surgery and feels if he gets sent to the ER enough . . . he will get his procedure[.]" (all caps in original omitted). Dr. Garcia also wrote, "Dr. Bredeman is aware of the PT and is in communication with Dr. Balcer about the need for surgery." (all caps in original omitted).

Plaintiff had a syncopal episode on November 1, 2014, and was found by an officer lying on the ground. On December 23 and again on December 28, 2014, custody called a Code 16 Emergency for Plaintiff due to chest pain. On January 6, 2015, Plaintiff was transferred from FRDC to Northeast Correctional Center ("NECC"). On January 12, 2015, Plaintiff's AICD/Pacemaker fired. Plaintiff saw a nurse practitioner at NECC who ordered he be air lifted to BJH. On January 15, 2015, Dr. Babich verbally authorized "cardiac surgery – septal

myectomy for the correction of HOCM." On January 23, 2015, Plaintiff underwent a septal myectomy at BJH performed by Dr. Spencer Melby.

Between August 8, 2014, and January 15, 2015, Plaintiff's AICD/Pacemaker fired five times. When asked what the normal response from a healthcare provider is when an AICD/Pacemaker fires, Dr. Melby testified:

> Well, it depends on what the patient's history is and what their known diagnoses are. If they have a known diagnosis of obstructive cardiomyopathy and they have been shocked, then they need to be referred to a surgeon and/or a specialist . . . so that they can have the appropriate intervention.

When asked whether Plaintiff's surgery could have been delayed by months without risk to him, Dr. Melby further testified:

> I would have recommended him to have it taken care of before he left [SMH]. So therefore that would classify it as urgent versus elective. . . I would not recommend waiting for months to do the surgery.

Between August 8, 2014, and January 15, 2015, no Referral Requests were submitted requesting approval for Plaintiff to have cardiac surgery or a septal myectomy.

The Provider Information Program is a manual ("PIP Manual") that outlines Corizon corporate practices and performance expectations for physicians. The PIP Manual includes a checklist of topical areas that new physicians must review within thirty (30) days of hire. One topic on the checklist is utilization management for inpatient and outpatient services. The Corizon Utilization Management Manual ("UM Manual") states, "The Utilization Management and Review process serves to evaluate the most appropriate medically necessary and cost contained health care services, procedures, and facilities for all patients." Utilization Management processes include the "[t]racking and/or management of . . . [h]igh-cost cases[.]" The PIP Manual states that "[c]ertain disease processes or medical conditions may warrant

7

additional scrutiny" and are reported to the Regional Medical Director for tracking. These Tracking List items include "Cardiology – Catheterizations and Interventional Procedures."

Defendant Corizon is paid on a per diem basis – a set amount per inmate per day – and all costs associated with inmate medical care are borne by Corizon regardless of the per diem rate. The UM Manual states, "Authorization is required for [an off-site] provider to bill for services, submit claims, and receive payments." When an ER visit results in an inpatient hospitalization, certain UM processes are triggered, including concurrent review. Concurrent review requires the Regional Medical Director/Associate Regional Medical Director to review daily clinical reports and communicate with hospital attending physicians to determine whether continued hospitalization is required. Corizon policy documents state, "If the attending physician and the RMD or designee do not agree on the continued hospitalization, the RMD or designee will inform the attending physician that additional inpatient days are not authorized. Additionally, the RMD will . . . inform [the hospital] that payment for subsequent days is not authorized."

## III.   Discussion

### A.   Defendant Corizon

"A corporation acting under color of state law will be held liable under section 1983 for unconstitutional policies, but will not be liable on a respondeat superior theory." *Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2011) (citations omitted). Section 1983 liability for a constitutional violation may be found against a corporation if the constitutional violation resulted from (1) an official policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted). "[I]n order for [corporate] liability to attach, individual liability first must be

found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (citations omitted).

          i.        **Underlying Constitutional Violation – 8th Amendment Deliberate Indifference**

"A claim of deliberate indifference has both an objective and a subjective component." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009) (citation omitted). *Id.* The objective component requires proof of a serious medical need. *Id.* The subjective component requires proof that a state actor had knowledge of the serious medical need but deliberately disregarded it. *Id.* "Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub v. Vonwald*, 638 F.3d 905, 914-15 (8th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

Defendant Corizon does not argue that Plaintiff did not have a serious medical need. Rather, Defendant Corizon argues it is entitled to summary judgment because "Plaintiff's records show that he was properly and regular[ly] assessed for his complaints of chest pain, syncope, and dizziness." (Doc. #107, p. 8). Defendant Corizon argues, "Dr. Garcia, the provider primarily responsible for the decisions concerning Plaintiff's treatment, reasonably exercised his medical judgment when developing Plaintiff's plan of care. It was reasonable for him to rely on the recommendations of the cardiology team at St. Mary's Hospital, who said that Plaintiff's cardiac obstruction was mild and did not require immediate surgery. SOF ¶ 47-48."

The record evidence relied on by Defendant Corizon at SOF ¶¶ 47-48 is that Plaintiff testified Dr. Balcer and Dr. Sanfelippo told Plaintiff during his September 4 hospital admission that his HOCM was "mild" and did not require surgery at that time. Defendant Corizon does not rely on or cite to the Court any record evidence that anyone at Defendant Corizon was told

Plaintiff's surgery could be delayed for months, and none of Plaintiff's medical records reflect that advice. On August 30, 2014, Dr. Deligonul opined Plaintiff was a candidate for either septal ablation or septal myectomy and would need to be referred to BJH. Dr. Sanfelippo's notes from SMH on September 5, 2014, characterize Plaintiff's condition as "mild to mod obstruction[.]" On or around the same date Dr. Balcer opined, "I think it is reasonable to discharge him to outpatient follow up, as I am told he has a follow up appointment at Barnes Hospital next week." The "Summary of Care" from Plaintiff's September 4 hospital admission lists "chest pain" and "Cardiomyopathy" as diagnoses and states, "Follow up instructions: Barnes Jewish Hospital, keep your appointment with Cardiology as scheduled." The "Summary of Care" was reviewed by Dr. Garcia. Plaintiff's testimony alone does not lead to the inference that Defendant Corizon suggests, i.e., that Dr. Garcia reasonably relied on SMH doctors' advice that Plaintiff's surgery could be delayed for months.

Defendant Corizon also argues Plaintiff did not suffer an actionable injury because his septal myectomy surgery was merely delayed for four months. As stated by the Eighth Circuit, "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Crowley v. Hedgepeth*, 109 F.3d 500, 501 (8th Cir. 1997) (citation and quotation marks omitted). Plaintiff's AICD/Pacemaker fired five times between August 8, 2014, and January 15, 2015, and Plaintiff suffered numerous syncopal episodes, one of which required stitches to his head. Dr. Melby testified he would have recommended Plaintiff have the procedure before he left SMH, and he would not have recommended waiting for months to perform the surgery.

Based on the totality of the evidence presented, the Court finds that a reasonable factfinder could conclude that Plaintiff's medical providers knew of Plaintiff's serious medical need but disregarded it and that the delay in Plaintiff's septal myectomy surgery detrimentally affected him.

    ii.  **Policy, Custom, or Deliberately Indifferent Failure to Train or Supervise**

To succeed on a § 1983 claim against a corporation, Plaintiff must establish that Defendant's custom, policy, or practice was "the moving force behind a constitutional violation." *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016) (citation and internal quotation marks omitted). Defendant Corizon argues it is entitled to summary judgment because "Corizon's policies promote the exercise of its staff physicians' medical judgment[,]" and "Plaintiff's extensive medical records belie any suggestion that there existed any sort of atmosphere to deny him necessary care." (Doc. #107, p. 12). Plaintiff counters that "Corizon's corporate policies, customs, and practices evince a widespread pattern of unconstitutional misconduct that collectively occasioned a five-month deferral of his open heart surgery – a deferral that caused him a great deal of pain and exacerbated his fear of dying." (Doc. #131, p. 134).

Plaintiff cited to the Court several of Defendant Corizon's policies that focus on cost-containment measures, particularly for cardiovascular care and/or care necessitating extended hospitalization and surgery. While Defendant Corizon argues its policies allow its physicians discretion to exercise medical judgment, a reasonable factfinder could conclude that this discretion is illusory given the policies' countervailing focus on cost-containment. Accordingly, Defendant Corizon is not entitled to summary judgment on this basis.

Plaintiff's claims for deliberately indifferent failure to supervise and train also survive summary judgment. Defendant Corizon argues, "To establish a claim for failure to supervise or

failure to train against Corizon, Plaintiff must present evidence that a Corizon official was aware of a widespread pattern of abuses resulting from a policy or lack of policy for cardiovascular care." (Doc. #107, p. 12) (citing *Rothman v. Lombardi*, 4:11-CV-639 CEJ, 2013 WL 4855301, at *6 (E.D. Mo. Sept. 11, 2013). Plaintiff cited to the Court Corizon policies related to cardiovascular care that were intended to contain costs by imposing additional oversight and tracking. Plaintiff also cited to the Court Dr. Garcia's notes that Associate Regional Medical Director Bredeman was "aware of the PT and [was] in communication with Dr. Balcer about the need for surgery." The Court finds based on the totality of the evidence presented by Plaintiff that a reasonable juror could conclude Defendant Corizon's training and supervision directives to its medical providers resulted in the delay of expensive but necessary medical procedures for inmates, including Plaintiff.

    **B.**    **Defendant Sturm**

"Because vicarious liability is inapplicable to . . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A prison official's general responsibility for the operation of a prison is insufficient to establish personal involvement. *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). "Supervisors can . . . incur liability for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (internal quotations and citation omitted). "[A] supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee

caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted).

Plaintiff presented no evidence that Defendant Sturm was aware of Plaintiff's medical condition at any point between August 8, 2014, and January 15, 2015. Plaintiff argues that "Sturm's corrective inaction in redressing deficiencies identified in health care delivery posed a substantial risk of serious harm to all inmates confined in MDOC facilities, including [Plaintiff]." (Doc. #131, p. 137). The deficiencies identified by Plaintiff include nurses not following protocol when addressing inmates' chest-pain complaints. Plaintiff, however, has not put forth any evidence connecting any of these "deficiencies" to Plaintiff's injury, i.e. the delay in obtaining a necessary surgical procedure.

As a result, Plaintiff has not produced sufficient evidence to create a genuine issue for trial on either Count IV or Count V against Defendant Sturm. The Court will not address Defendant Sturm's qualified immunity argument in light of the ruling on summary judgment.

## IV. Conclusion

Accordingly, Corizon LLC's Motion for Summary Judgment (Doc. #106) is DENIED and Defendant Sturm's Amended Motion for Summary Judgment (Doc. #116) is GRANTED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: March 18, 2019